No. 25-3097

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

ANGELIINA LYNN LAWSON,

*Respondent - Appellant,*

v.

JONATHAN DAVID LAWSON,

*Petitioner - Appellee*

ON APPEAL FROM U.S. DISTRICT COURT OF KANSAS

Case No. 5:25-cv-4045 | Hon. John W. Broomes, U.S. District Judge

Removed from Anderson County District Court – Case No. 2020-DM-000131

Appealed May 30, 2025

OPENING BRIEF OF RESPONDENT- APPELLANT

ORAL ARGUMENT REQUESTED

Angeliina Lynn Lawson, Pro Se Appellant



Filed via CM/ECF – No Paper Copies Required Unless Requested

July 22, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................5

STATEMENT OF RELATED CASES ...................................................8

JURISDICTIONAL STATEMENT ........................................................8

STATEMENT OF ISSUES ON APPEAL ..............................................9

STATEMENT OF THE CASE ............................................................11

    I. Nature of the Case .....................................................................11

    II. Constitutional Stakes ...............................................................13

    III. Factual Background ................................................................14

        A. Denial of Communication Access ........................................15

        B. Denial of Records and Transcripts ......................................17

        C. Exclusion from Proceedings ...............................................19

        D. Procedural Obstruction and Retaliation ..............................21

        E. Post-Removal State Court Misconduct .................................25

        F. District Court Proceedings ...................................................26

STANDARD OF REVIEW ................................................................31

SUMMARY OF THE ARGUMENT ...................................................33

ARGUMENT ..................................................................................39

    I. The District Court Erred by Holding that Title II of the ADA Does Not Qualify Under 28 U.S.C. § 1443(1) ......................................................40

A. Text and Purpose of § 1443(1) Do Not Restrict it to Race ...................... 40

B. ADA Title II's Equal-Access Mandate is Grounded in Fourteenth

Amendment Principles ......................................................................... 41

C. Supreme Court Precedent Confirms Title II Enforces Equal Rights ....... 42

D. Johnson's Race-Only Interpretation is Outdated and Unconstitutional if

Applied to ADA Rights ......................................................................... 45

II. Appellant Was Denied and Cannot Enforce Her ADA Rights in Kansas

Courts ...................................................................................................... 47

A. Systemic Refusal of ADA Accommodations and Access ...................... 47

B. Procedural Barriers and Retaliation Show Inability to Enforce Rights....50

C. The Case Presents an Instance of Rights Denial Without A Facial

Statutory Violation…………………………………………………..52

III. The Premature Remand Deprived Appellant of Due Process and

Undermined § 1443(1)  Review …………………………………………… 54

A. Full Scope of Appellate Review Is Permitted Under § 1447(d) ............. 54

B. Failure to Address Jury Demand and Evidentiary Motions ................... 55

C. Premature Remand Enabled Irreparable Harm ....................................... 57

CONCLUSION ....................................................................................... 58

RELIEF REQUESTED…………………………………………………..59

CERTIFICATE OF COMPLIANCE ................................................................ 60

STATEMENT OF REGARDING ORAL ARGUMENT ………………………..61

CERTIFICATE OF SERVICE ...........................................................................61

---

## TABLE OF AUTHORITIES

CASES

1. Supreme Court – Equal Protection & Disability:

   Tennessee v. Lane, 541 U.S. 509 (2004) ……………...…………. *14,29,34,35,44*

   United States v. Georgia, 546 U.S. 151 (2006) ……………………………..*35*

   Olmstead v. L.C., 527 U.S. 581 (1999) ……………………………………….*44*

   PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001) ……………..……………..…*31*

   Haaland v. Brackeen, 599 U.S. ___, 143 S. Ct. 1609 (2023)…… …………..*34*

   Students for Fair Admissions, Inc. v. Harvard College, 600 U.S. ___, 143 S.

   Ct. 2141 (2023) ……………………………………………………...………..*46*

2. Removal Jurisdiction & Civil Rights:

   Georgia v. Rachel, 384 U.S. 780 (1966)... *10,29,31,33,35,37,39,40-43,45-46,48,52*

City of Greenwood v. Peacock, 384 U.S. 808 (1966) ….… *29,33,35,36,43,51*

Johnson v. Mississippi, 421 U.S. 213 (1975) …..… *28,29,31,39,40,43,45,46*

BP P.L.C. v. Mayor of Baltimore, 141 S. Ct. 1532 (2021) …..….…*10,39,54*

Goshen Mortg., LLC v. Altier, No. 21-12496, 2023 WL 2478358 (11th Cir. Mar. 13, 2023) ……………………………………………………………*45*

Taos County Magistrate Court v. Currier, 625 F. App'x 358 (10th Cir. 2015) …………………………………………………………………….…*45*

3. Historical Civil Rights Precedents:

Brown v. Board of Education, 347 U.S. 483 (1954) …………………………*38*

Plessy v. Ferguson, 163 U.S. 537 (1896) ………………………………………*34*

Bradwell v. Illinois, 83 U.S. 130 (1873) ……………………………………….*46*

Korematsu v. United States, 323 U.S. 214 (1944) …………………………*58*

Shelley v. Kraemer, 334 U.S. 1 (1948) ……………………………….…*53*

Elrod v. Burns, 427 U.S. 347 (1976) ………………………………………*53*

4. ADA Enforcement & Access to Courts:

ADAPT of Philadelphia v. Philadelphia Housing Auth., 417 F.3d 390 (3d Cir. 2005)………………………………………………………………….…*43*

Tennessee Dep't of Children's Servs. v. Winesburgh, 614 F. App'x 277 (6th Cir. 2015) ………………………………………………………….……*49*

Winnebago Tribe of Nebraska v. Kinsley, 88 F.4th 1124 (8th Cir. 2023)

……………………………………………………………………………………*49*

Robinson v. Eichler, 795 F. Supp. 1253 (D. Conn. 1992) …………….…..*50*

Humphries v. Los Angeles County, 562 U.S. 29 (2010) …………………*49*

5. Federal Jury Trial Rights & Procedural Safeguards:

Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959) …………………*56*

## STATUTES & RULES

28 U.S.C. § 1291 – Final Decision Appeal …………………………………….*8*

28 U.S.C. § 1443(1) – Civil Rights Removal………...*8-15,26-35,37-48,51-54,57-60*

28 U.S.C. § 1447(d) – Reviewability of Remand Orders …………*9,10,31,38,39,54*

42 U.S.C. § 12131 et seq. – Americans with Disabilities Act (ADA) Title II ……*9*

42 U.S.C. § 12132 – ADA Title II ……………………………………………*42,48*

42 U.S.C. § 12203 – ADA Anti-Retaliation Provision…………………………*48*

42 U.S.C. § 1983 – Civil action for deprivation of rights ………………………*55*

Kan. Stat. § 75-4351 et seq. – Court interpreters……………………………*50*

## REGULATIONS & OTHER AUTHORITIES

28 C.F.R. §§ 35.160–35.164 – ADA Title II public entities ………………… …*16*

28 C.F.R. § 35.134 – ADA Title II anti-retaliation regulation………………….*20*

Fed. R. App. P. 32 & 10 – Brief format requirements; Record on Appeal ……*9,60*

*Legend:*

★ = Authority supporting ADA's inclusion under § 1443(1);

✦ = Authority limiting § 1443 to race-based rights (to be re-examined).

---

## STATEMENT OF RELATED CASES

Pursuant to 10th Cir. R. 28.2(C), Appellant notes a related federal action: *Lawson v. Godderz et al.*, No. 2:25-cv-02199 (D. Kan. filed May 2025), in which Ms. Lawson (the Appellant here) has sued Kansas state officials for civil rights violations arising from the same underlying facts. That case raises overlapping ADA Title II and constitutional claims regarding denial of access to courts. Its outcome could be affected by this appeal, as both matters involve the enforceability of Appellant's federal rights in the Kansas state judicial system. No other related cases are currently pending in this Court.

---

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's May 30, 2025 order remanding the case to state court is a final decision. Although

28 U.S.C. § 1447(d) generally bars appellate review of remand orders, that bar *does not apply* here because the removal was effectuated under the civil-rights removal statute, 28 U.S.C. § 1443(1). Section 1447(d) expressly provides that a remand order in a case removed pursuant to § 1443 "*shall be reviewable* by appeal or otherwise". As the Supreme Court recently confirmed, when removal is based in part on § 1443, the court of appeals retains jurisdiction to review the entire remand order. Appellant's Notice of Removal explicitly invoked § 1443(1) (civil rights removal), thereby triggering this Court's appellate jurisdiction under § 1447(d).

The district court entered its Final Remand Order on May 30, 2025. Appellant timely filed a Notice of Appeal on June 5, 2025 (within the 30-day limit of Fed. R. App. P. 4(a)). No post-order motions tolling the time to appeal were filed that would affect the timeline. Accordingly, this appeal is properly before the Tenth Circuit.

## STATEMENT OF ISSUES ON APPEAL

1. Whether Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, constitutes a "law providing for equal civil rights" within the meaning of 28 U.S.C. § 1443(1), thereby permitting removal to federal court when a disabled litigant is denied access to justice in state proceedings.

2. Whether the record demonstrates that Appellant has been "denied or cannot enforce" her ADA Title II rights in the courts of Kansas, satisfying the second prong of the removal test under § 1443(1) as established by *Georgia v. Rachel*, 384 U.S. 780 (1966).

3. Whether 28 U.S.C. § 1447(d), as interpreted by the Supreme Court in *BP P.L.C. v. Mayor of Baltimore*, 141 S. Ct. 1532 (2021), grants this Court jurisdiction to review the district court's remand order and all of its stated grounds, given that Appellant's removal was effectuated pursuant to § 1443(1).

4. Whether the cumulative acts of state-court retaliation, exclusion from proceedings, procedural obstruction, and denial of accommodations — as reflected in the record — constitute irreparable constitutional harm (violations of Equal Protection and Due Process) requiring immediate federal judicial intervention.

5. Whether interpreting § 1443(1) to categorically exclude disability-based civil rights claims creates an unconstitutional hierarchy of rights at odds with the Fourteenth Amendment's guarantee of equal protection, especially considering Supreme Court precedent recognizing the ADA's status as legislation enforcing equal rights.

6. Whether, if the question of ADA Title II's inclusion in § 1443(1) is one of first impression that this Court finds itself constrained to answer under existing precedent, this issue warrants certification to the United States Supreme Court (pursuant to 28 U.S.C. § 1254(2) and Tenth Circuit Rule 27.1) as a fundamentally important and unsettled question of federal law.

---

## STATEMENT OF THE CASE

### I. Nature of the Case

This appeal challenges a federal district court's remand of a case that Appellant Angeliina Lynn Lawson removed from Kansas state court under 28 U.S.C. § 1443(1). The underlying state case (Anderson County Case No. 2020-DM-000131) is a post-divorce and support proceeding that, according to Appellant, has been marred by egregious violations of her civil rights. Appellant — who is pro se and has a documented communication-related disability — alleges that Kansas state officials (including judges and court personnel) have systematically retaliated against her for attempting to assert her rights under ADA Title II in those proceedings. After experiencing repeated denials of due process and accommodations in state court, Ms. Lawson sought refuge in federal court via the civil-rights removal statute (§ 1443(1)) on May 6, 2025.

Upon removal to the U.S. District Court (Hon. John W. Broomes), Appellant promptly informed the federal court of ongoing misconduct by the state court clerk and officials aimed at undermining the removal. Despite these notices and a pending jury trial demand, the district court declined to hold any hearing and, just over three weeks later, issued an order remanding the case to state court. The district court's sole rationale was that § 1443(1) does not extend to ADA-based claims — relying on an interpretation that the statute covers only race-related civil rights. In doing so, the court did not address the extensive factual record of disability-based denial of rights, nor did it consider Appellant's outstanding motions or her request for a jury trial in federal court.

Appellant now appeals that remand order. She contends that the lower court applied an unduly narrow and outdated interpretation of § 1443(1). The core issue is whether a disabled litigant who has been denied basic access and equal treatment in state court may invoke § 1443(1) to have her case heard in federal court. This is a question of first impression with broad implications: if ADA Title II — a statute grounded in Equal Protection — is excluded from § 1443(1), then disabled persons would enjoy *inferior* access to federal protection compared to other civil-rights claimants. Appellant maintains that such an outcome contradicts the text of § 1443(1) (which refers to "any law" providing for equal civil rights) and the spirit of modern civil-rights jurisprudence.

## II. Constitutional Stakes

At its heart, this case is about equal access to justice. Appellant asserts that the Kansas court's actions have effectively nullified her fundamental rights as a litigant and as a parent, solely because she insisted on the accommodations and due process to which she is entitled under federal law. The constitutional stakes are high: the facts suggest that a state judge and court officers, acting under color of law, retaliated against a disabled individual for invoking subject matter jurisdiction and was faced with a hostile judge who refused to take up a hearing to change the venue and retaliated by stripping her of custody, sealing records, and excluding her from her own case's proceedings. These acts, if proven, implicate the Equal Protection Clause (disability discrimination) and the Due Process Clause (denial of a meaningful opportunity to be heard).

The district court's remand order, if allowed to stand, would leave these serious deprivations unredressed. It would mean that no federal forum is available to stop or even review a state judiciary's alleged misconduct, so long as the victim's civil rights do not fit within a narrow, race-centric reading of the removal statute. This raises a profound constitutional concern: Does the Fourteenth Amendment tolerate a scheme whereby only certain classes of civil-rights claimants (e.g. those asserting race discrimination) can seek federal protection under § 1443, while others (like

the disabled) must remain at the mercy of potentially hostile state tribunals? Such a disparity suggests a caste-like hierarchy of rights that is anathema to equal protection principles.

The Supreme Court has repeatedly emphasized that access to courts is a fundamental right and that state actions which impede that access strike at the heart of the Fourteenth Amendment. In *Tennessee v. Lane*, for example, the Court recognized not only that Title II of the ADA was valid Fourteenth Amendment legislation, but that denial of court access to persons with disabilities is a well-documented, pervasive problem that Congress had authority to redress. If the federal courts are closed to a litigant in Appellant's position, then the promise of *Lane* and similar cases — that disabled individuals cannot be arbitrarily excluded from civic life and public institutions — would ring hollow.

In sum, this appeal is about ensuring that federal civil rights laws have meaning in practice. Appellant urges that § 1443(1) must be interpreted in a manner consistent with its text and broad remedial purpose: to provide a federal forum when state processes break down or are tainted by injustice. The outcome will determine not only the course of Ms. Lawson's case, but also whether the federal judiciary stands ready to intervene when *any* class of citizens (not just those protected by 19th-century civil rights laws) are systemically denied their equal rights in state courts.

III. Factual Background

The relevant facts are drawn from the record of the state court proceedings and the filings in the federal district court, as cited below. They detail a troubling pattern of events that led Appellant to seek removal under § 1443(1).

A. Denial of Communication Access

Appellant has a communication disability that affects her ability to process spoken information in real time. Despite being a "qualified individual with a disability" entitled to accommodations under Title II of the ADA, she was repeatedly denied such accommodations in the Kansas proceedings. For instance, although Appellant requested CART (Communication Access Realtime Translation) captioning or similar aids to follow courtroom proceedings, the state court provided no real-time captioning or functional equivalent during critical hearings. Transcripts or caption notes were only made available, if at all, after the fact and without notice to Appellant.

In one egregious example, on May 8, 2025, the state court conducted a Zoom hearing after Notice of Removal was filed. Appellant was never given the Zoom link but found an old version and initially was not admitted to the Zoom session — she waited in the virtual lobby for over 11 minutes while proceedings went on

without her. When she was finally allowed into the hearing (after objecting via emails), the judge and parties were already discussing substantive matters. Appellant immediately stated on the record that the case had been removed to federal court and objected to the state court's jurisdiction. The presiding state judge (Hon. Eric W. Godderz) first claimed that he had not received any federal removal notice, then belatedly acknowledged the filing, yet proceeded with the hearing regardless. During this hearing, unknown to Appellant at the time, the court had a CART captioner (Rhonda R. Wise) transcribe the session internally, but Appellant was never provided access to these CART notes in real-time or afterward. The state docket later showed an entry "CART notes from Hearing (5/08/2025) – Index #45," but those notes were locked from public view and not provided to Appellant.

This incident was not isolated. Throughout 2024 and 2025, Appellant's requests for communication assistance (e.g., consistent provision of transcripts, use of hearing assistive technology) were denied or met with *performative* gestures. Internal records indicate the court's staff conducted CART "test sessions" behind the scenes, but never actually enabled Appellant to utilize CART during live proceedings. Instead of engaging with Appellant to accommodate her disability, officials often re-characterized her accommodation requests as disruptions or treated them as unreasonable. This had the practical effect of excluding Appellant from meaningful participation: she could not fully understand or engage in

hearings that directly affected her parental rights. These incidents reflect a conflict with established guidance, see 28 C.F.R. §§ 35.160–35.164.

B. Denial of Records and Transcripts

Access to court records is a basic element of due process, yet Appellant was persistently denied timely access to filings and orders in her case. For significant periods, she was blocked from viewing the court's docket and recent entries, hindering her ability to know what was happening in her own case. The Anderson County Clerk's office failed to provide certified copies of filings that Appellant needed for appeals or federal removal, even when such copies were requested and required by law (e.g., 28 U.S.C. § 1446(a) mandates attaching all state court pleadings to the notice of removal).

Notably, after Appellant filed the Notice of Removal on May 6, 2025, the state clerk did not docket the removal in the state case until May 8 after hearing – two days later – and when she did, it was mislabeled as mere "correspondence" and locked from public access (Index #44). By mislabeling the removal notice, the clerk treated this jurisdictional document as a negligible letter, rather than an official filing that should halt state proceedings. This mislabeling and delay meant that as of the morning of May 8 (when the judge convened the hearing), the state court's docket did not clearly reflect that the case had been removed. The state

judge's initial claim of ignorance about the removal was thus a direct result of his own clerk's failure to promptly or properly docket the notice.

Appellant's attempts to obtain transcripts of hearings and copies of new orders were also thwarted. For example, after the May 8 hearing, the clerk entered cryptic references to "CART notes" (Index #45) and a court reporter's name (Index #46), but provided Appellant no copy or link to any transcript or notes. Similarly, filings that Appellant submitted (such as objections or designations of record for appeal) were not entered on the docket in a timely fashion. Appellant's *Designation of Record for Federal Removal* (intended to identify necessary state records for the federal court) was filed on May 13, 2025, yet the clerk did not properly index or forward several of those items. As late as May 12, 2025, an updated printout of the state docket showed no entries for key documents that had been submitted after May 8 (including Appellant's post-hearing objections and a notice of withdrawal of counsel). This pointed to ongoing suppression or tampering with the record: the absence of entries created a false impression that Appellant had not pursued certain remedies, when in fact she had.

Appellant raised these issues in federal court filings. On May 7, she filed a Supplemental Notice of Removal and Affidavit detailing how the state clerk "failed or refused to docket" the removal, constituting procedural obstruction. She

attached exhibits, including an email to Clerk Tina Miller inquiring about the missing docket entry and a fax confirmation of the removal notice sent on May 6. On May 9, Appellant filed a Second Notice of Clerk Obstruction and ADA Noncompliance, informing the federal court that she still could not obtain certified records and that the clerk had, without notice, entered CART notes under seal. These filings make clear that denial of records access was not a one-off mistake but an ongoing tactic that impeded Appellant's ability to advocate for herself both in state and federal court.

C. Exclusion from Proceedings

Beyond issues of communication and records, Appellant was at times completely excluded from participating in court proceedings affecting her rights. The May 8, 2025 incident (where she was kept out of the Zoom hearing for its first 11 minutes) is one example. There were earlier instances in 2024 and 2023 where hearings or conferences apparently took place without proper notice to Appellant, or where decisions were made in chambers without her presence or input.

Crucially, starting in late 2024, the state court appointed a Guardian ad Litem (GAL) for Appellant's minor child and increasingly routed substantive decisions through the GAL and *ex parte* communications. According to Appellant, the GAL (an attorney named Andrew Bolton) operated to sideline her: he facilitated changes

in the child's custody *without court hearings all ex parte*. When Appellant tried to challenge these actions (filing motions to enforce visitation orders or to remove the GAL for misconduct), the state court ignored her filings. This retaliation violates 28 C.F.R. § 35.134 denying Appellant services without process.

By early 2025, the state judge had not ruled on a critical motion – Appellant's counsel's motion to withdraw – leaving Appellant in a procedural limbo regarding representation. She wanted to represent herself (pro se), but the court denied attorney's withdrawal and her motion for self-representation. Instead, the judge continued to treat communications from the outgoing attorney as if he still represented Appellant, while simultaneously preventing Appellant from filing on her own. This effectively silenced Appellant's voice in her own case. (Eventually, on May 14, 2025 – notably, after the case had been removed – the state court belatedly signed an order allowing that attorney to withdraw. But by then Appellant had already missed critical opportunities to be heard.)

In sum, by a combination of procedural maneuvers – failing to notify Appellant of hearings, conducting conferences without her, using the GAL as an intermediary, sealing records, and imposing financial hurdles – the Kansas court systematically prevented Appellant from fully participating in the adjudication of her parental rights.

## D. Procedural Obstruction and Retaliation

The record indicates that Appellant's attempts to assert improper subject matter jurisdiction with motions to change venue were ignored and judge openly told her he "will never allow a hearing because not one of his cases will leave his county and he is too familiar with the parties, especially that mother!" Her attempts raise concerns were not merely ignored; they were met with affirmative pushback that can be characterized as retaliatory. Each time Appellant took an action that challenged the status quo or exposed misconduct, the response was an escalation against her position in the case.

For example, Appellant filed multiple ADA grievances with the Kansas Office of Judicial Administration, complaining of lack of accommodations and discrimination by the local court staff. She also pursued a writ of mandamus in the Kansas appellate courts seeking to compel the trial court to allow her self-representation and to change venue due to bias. Additionally, she lodged a judicial conduct complaint against Judge Godderz and reported the GAL's actions as *ultra vires* and abusive. According to Appellant, none of these avenues yielded relief — in fact, they may have exacerbated her plight. Shortly after these efforts, the state court's treatment of her worsened:

- Retaliatory removal of custody: In fall of 2024, Appellant's minor child was removed from her physical custody entirely. The removal occurred without any allegations of unfitness, any evidentiary hearing or notice, denied a hearing or ability to speak. Appellant asserts this was a punitive measure driven by animosity toward her for addressing subject matter jurisdiction was improper, her ADA advocacy and whistleblowing. Notably, the removal coincided with the GAL and opposing counsel citing Appellant's filings and complaints as purported evidence that she was *"difficult"* or *"uncooperative."* Those filings were her exercising legal rights (reporting child abuse, child pornography, hidden assets, failing grades, medical neglect, predatory alienation targeting mother-child bond, seeking ADA advocacy for child's disability), which should not be grounds for losing custody.

- Suppression of evidence: Appellant had tried to bring forth evidence of abuse concerning the child (for example, emails from the child reporting they were being threatened by GAL and physically abused by father or that the father violated court orders and lied to police). She contends that these reports were suppressed, omitted, or not properly investigated and court officials committed fraud on the court. Instead, the narrative in court shifted

to painting Appellant's concerns as a nuisance or delusional, thereby punishing her for attempting to protect her child.

- Criminalization of ADA requests: After Appellant filed the federal removal, the state court reacted by treating her as a troublemaker. The notes of the May 8 hearing shows Judge Godderz dismissively noting the removal and pressing on with business. Moreover, the state court began accusing Appellant of *"not following procedures"* or *"causing delays,"* when in fact it was the court's own failure to accommodate that led to those issues. This tactic of shifting blame is evidenced by how the clerk mislabeled the removal as "correspondence" (implying Appellant didn't properly remove), and the judge initially claiming no knowledge of it – framing the situation as if Appellant was in error.

- Patterned enterprise allegations: Appellant filed a *"Notice of Patterned Enterprise and Racketeering"* in the federal case (Dkt. 18) after the remand recommendation, outlining what she perceived as a collusive scheme among local officials to violate civil rights after obtaining open records. In these records stated more than 30 court officials coordinating Litigation Hold documents, her medical records and accommodation denials and her court filings. She also needed to file a *"Notice of Criminal Investigation"* (Dkt. 21) referencing that federal law enforcement had been alerted to fraud

on the court and that local state police had submitted their reports for criminal charges to the District Attorney against several of the parties involved in the cover up of child abuse. While these filings are not traditional motions, they underscore Appellant's experience of the retaliation against her. This was organized and not merely the result of one rogue judge. (The appellate brief does not rely on these "RICO" or criminal allegations for relief, as those go beyond this Court's purview – they are mentioned here solely to illustrate the extent of the breakdown in normal process that had occurred.)

In the short time the case was in federal court before remand prematurely, Appellant submitted over a dozen documents to create a clear record of the state court's obstruction. The Third Notice of Continued Docket Suppression filed May 12, 2025 (Dkt. 15) encapsulated many issues: it reported that even after removal, the Anderson County Clerk was *still* failing to docket new filings (like Appellant's post-removal objections) and pointed out irregularities in the docket indexing (e.g., the docket had missing entries for a whole year of litigation, suggesting selective backdating or purging). By documenting these facts for the federal court, Appellant was effectively saying: *"Look, the state court is not just unfair – it is actively sabotaging my ability to seek relief. I need this federal court to intervene, or I have no chance at justice."*

E. Post-Removal State Court Misconduct

Despite the removal to federal court being legally effective as of May 6, 2025 (when notice was given to the state court), the state court did not halt its proceedings. Instead, it carried on as if no removal had occurred, at least until mid-May when the federal remand became likely. This continuation was itself a violation of 28 U.S.C. § 1446(d), which states that once the state court is notified of removal, "the State court shall proceed no further unless and until the case is remanded."

The May 8 hearing (described above) is the prime example: substantive issues were discussed and even decided during a time when jurisdiction should have vested exclusively in the federal court. Appellant explicitly objected on the record, citing § 1446(d), but was overruled or ignored. In effect, the state court defied the removal stay and then attempted to cover its tracks by inserting CART notes post hoc to suggest Appellant had some access (when she did not).

Moreover, after the federal Magistrate Judge issued a very quick Report and Recommendation on May 15, 2025 (recommending remand in only 9 days on the docket), the state court seemingly anticipated the case's return. On May 22, with the federal remand order still not final, the GAL and father's attorney filed new motions in state court (e.g., a motion for payment of GAL fees, another motion to

withdraw by the GAL). These entries (Index #49 and #50) show that the state actors did not respect the federal removal – they continued litigating. The state judge even signed an order on May 14 allowing Appellant's attorney to withdraw (Index #48), which one could argue he had no authority to do while the case was removed. All of this underscores Appellant's argument that the state court was determined to maintain control of the case, even with the fundamental error of never having subject matter jurisdiction from the beginning, and was not going to enforce her federal rights. This is precisely the scenario § 1443(1) was designed for: where it can be "clearly predicted" that the petitioner's rights "will inevitably be denied" in state court.

Following the eventual remand on May 30, 2025, Appellant reports that the retaliation continued unabated: she remained barred from accessing certain dockets, the state court scheduled further proceedings without addressing any ADA accommodations, and her child remained in the custody of the opposing party without a full and fair hearing to extort finances and direct arrears. In other words, the very harm Appellant feared – being returned to a forum that refuses to acknowledge her rights – came to pass once the federal protection was removed.

F. U.S. District Court Proceedings

In the federal court (District of Kansas, Case No. 5:25-cv-04045), the following key events transpired in May 2025 after Appellant's removal:

- Initiation and Motions: On May 6, 2025, Appellant filed her Corrected Notice of Removal (Dkt. 6), invoking 28 U.S.C. § 1443(1) and outlining systemic civil rights violations. She simultaneously submitted an in forma pauperis application, which the court granted—but despite this acknowledgment of indigency, the magistrate judge failed to provide full access to federal procedures, including denying adjudication of her jury demand and pending motions, thereby obstructing her due process rights at the outset of removal. Within the next few days, Appellant filed several motions and notices: a *Supplemental Notice of Removal* with evidence of clerk obstruction (Dkt. 8, filed May 7); a *Motion to Compel Access to State Court Records* (Dkt. 10, filed May 7) – seeking a federal order to get the state to release the docket and filings; a *Supplemental Notice of Post-Removal ADA Obstruction* (Dkt. 11, filed May 8); and the *Second Notice of Clerk Obstruction* (Dkt. 12, filed May 9). These documents were aimed at preserving evidence and alerting the federal court that the state court was actively undermining the removal and violating Appellant's rights even after removal.

- Magistrate Judge's R&R: Without holding any hearing, Magistrate Judge Teresa J. James considered the papers in (nine days since docketing and jury trial demanded), on May 15, 2025, issued a Report and Recommendation (R&R, Dkt. 16). The R&R recommended that the case be remanded to state court on the sole ground that Appellant's removal did not satisfy the first prong of § 1443(1) because, under *Johnson v. Mississippi*, 421 U.S. 213 (1975), § 1443 is limited to rights "stated in terms of racial equality." In other words, the Magistrate Judge accepted that ADA Title II is not within the ambit of "any law providing for equal civil rights" as used in § 1443(1). The R&R did *not* substantively engage with Appellant's evidence of denial of rights, essentially mooting the second prong by finding the first unsatisfied. It also did not address Appellant's jury trial demand (which was noted in the removal notice's caption) or her pending motions like the motion to compel records. The R&R's analysis was brief and anchored in decades-old case law rather than the factual complexities at hand.

- Objection to R&R: Appellant filed timely objections to the R&R (Dkt. 17, filed May 19, 2025). In her objection, she argued that the Magistrate Judge's view of § 1443(1) was overly narrow, pointing out that the statute's text says, "any law" and that ADA Title II was enacted under the Equal Protection Clause, thus should qualify. She cited Supreme Court decisions

like *Tennessee v. Lane* to emphasize that disability rights are civil rights. She also highlighted the exceptional circumstances of her case – the state court's open defiance of federal law – which she argued fit the rationale of *Rachel*'s "denied or cannot enforce" test even absent an explicit discriminatory statute (analogizing her situation to a structural inability to get a fair hearing, akin to the rare scenarios contemplated by *Rachel* and *Peacock* when state proceedings themselves are the source of rights denial).

- Additional Filings: While objections were pending, Appellant submitted a few more notices (Dkts. 18, 19, 21 as mentioned above) documenting new incidents or evidence (e.g., coordination among actors to retaliate, and notice that a federal criminal inquiry had been sought). She also received an order denying her motion to compel records (Dkt. 20, entered by the Magistrate Judge presumably around May 25) – which meant the federal court would not intervene to get her the state court documents.

- Final Order: On May 30, 2025, District Judge Broomes issued an order adopting the R&R and remanding the case to state court (this is Dkt. 22 on the district docket). The Final Remand Order essentially agreed that, as a matter of law, removal was improper because Appellant's claims, being rooted in disability rights and general due process, do not fall under the limited scope of § 1443(1) established by *Georgia v. Rachel* and *Johnson v.*

*Mississippi*. The order did not address Appellant's ADA arguments about modern equal protection, nor did it refute her factual showing that she could not enforce her rights in state court. It also did not mention the writ of certiorari or the jury demand or any request for an evidentiary hearing, even though Appellant had implored the court to consider the evidence of bad faith at least before deciding. In practical effect, the federal court closed the case very quickly and returned it to the very state system that, according to Appellant, was persecuting her.

- Post-Remand Preservation: Immediately after remand, Appellant filed a Rule 60(b)(3) "Preservation Notice" in the district court (Dkt. 30, filed June 2025) to document what she called "fraud on the court" and to ensure the record reflected her continuing objection. Although that filing had no effect on the remand (since the case was already remanded and the district court lost jurisdiction), Appellant did this to signal her intent to seek appellate review and to make a record that the proceedings were, in her view, tainted.

In summary, the federal court proceedings were cut short, way too short, by the district court's threshold legal ruling. Appellant did not have the opportunity to have her motions heard or to present evidence live. The case rises to this Court on a clean legal question: was the district court correct that removal under § 1443(1)

is unavailable to someone in Appellant's shoes? Appellant contends the answer is no, and that the court's extreme rush to remand without grappling with the unique facts constituted error.

---

## STANDARD OF REVIEW

The issues on appeal are primarily legal, procedural, and jurisdictional. Whether removal was proper under 28 U.S.C. § 1443(1) – including the interpretation of what qualifies as a "law providing for equal civil rights" and whether the statutory prerequisites are met – is a question of law reviewed de novo. See *Georgia v. Rachel*, 384 U.S. 780 (1966); *Johnson v. Mississippi*, 421 U.S. 213, 219 (1975); PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001), interpretation of § 1443 is reviewed independently by the appellate court. Because the district court's decision rested on statutory interpretation and did not involve fact-finding (indeed, it assumed the truth of Appellant's allegations for the sake of analysis), this Court owes no deference to the lower court's conclusions.

To the extent the appeal involves reviewing a remand order, the Court must be mindful of § 1447(d)'s constraints. However, as established, those constraints do not apply here – thus this Court's review extends to *all* grounds the district court relied on (or could have relied on) for remand. The denial of Appellant's request

for a jury trial and the failure to consider her pending motions before remand are also reviewed de novo or for abuse of discretion, as they implicate due process and the proper procedure for handling removed cases.

Notably, when reviewing a civil-rights removal under § 1443, appellate courts often consider the entire context to determine if the statutory criteria are met. The inquiry is somewhat unusual in that it straddles law and fact: the first prong (is the right asserted a "right under any law providing for equal civil rights"?) is a pure question of law; the second prong (will the petitioner be denied that right in state court?) can be a mixed question but is typically treated as a legal determination based on the given factual record. In this case, many of the relevant facts are documented and undisputed (e.g., what happened procedurally in state court), so whether those facts rise to the level required by § 1443(1) is an issue this Court decides de novo.

Preservation of Issues: Appellant raised all pertinent arguments below. She specifically argued that ADA Title II is an equal civil rights law (first prong) and provided evidence of denial of rights (second prong). These issues are thus properly before the Court. The appellate posture is slightly unusual since the case did not proceed past the pleadings stage in federal court – but there is a sufficient record from the removal notice and subsequent filings to inform this Court's

review. No additional evidence is necessary to resolve the legal questions

presented, though the Court has the authority to take judicial notice of the whole

Notice of Appeal from state court to US District Court with certain

incontrovertible facts such as the content of the state court docket and the timing of

events (many of which are part of the record via Appellant's filings).

---

## SUMMARY OF THE ARGUMENT

1. ADA Title II is a "Law Providing for Equal Civil Rights" Under § 1443(1). The

text of 28 U.S.C. § 1443(1) permits removal by any person who is denied or cannot

enforce "a right under any law providing for equal civil rights." Nothing in the

statute's language limits it to race-related civil rights. The narrow interpretation –

that "any law" really means only laws dealing with racial equality – stems from

1960s-era Supreme Court decisions (*Rachel* and *Peacock*), which in turn were

driven by the historical context of racial discrimination and the Civil Rights Act of

1964. However, those cases never held that only race-based claims are allowed;

rather, they dealt with the paradigmatic instance of race discrimination and left

open the possibility that other equal rights could qualify. Title II of the ADA was

enacted under Congress's Fourteenth Amendment power to enforce equal

protection and due process. It expressly aims to eliminate discrimination against

individuals with disabilities and guarantee them equal participation in public services, including courts. The ADA's text and legislative findings speak in terms of equality of opportunity and ending exclusion – the very language of civil rights. It is thus a "law providing for equal civil rights" no less than the Civil Rights Act or Voting Rights Act. The district court's contrary conclusion relies on outdated precedent and ignores the evolution of federal civil rights protections since 1966.

Upholding a rule that limits § 1443(1) to racial claims alone is tantamount to reaffirming the flawed logic of *Plessy*, where formal equality masked institutional exclusion. This Court should not let modern civil rights—like those under the ADA—suffer the same fate.

2. Modern Supreme Court precedent recognizes disability rights as fundamental civil rights. In *Tennessee v. Lane* (2004), the Supreme Court upheld Title II of the ADA as valid § 5 legislation addressing the fundamental right of access to courts. The Court acknowledged widespread *"pervasive unequal treatment…in the administration of state services"* with respect to disabled persons, including "systematic deprivations of fundamental rights" like court access. Thus, Title II is firmly grounded in enforcing equal protection and due process guarantees. In *Haaland v. Brackeen*, 143 S. Ct. 1609 (2023), the Supreme Court reaffirmed that Congress possesses broad authority under the Constitution to enact laws that

address systemic discrimination and protect vulnerable populations—emphasizing the government's legitimate role in redressing generational harms. This underscores that modern civil rights statutes, like the ADA, are equally within Congress's enforcement power under the Fourteenth Amendment and thus fall within the protective scope of 28 U.S.C. § 1443(1). *Lane* and subsequent cases (like *United States v. Georgia* (2006)) confirm that Title II stands on equal footing with other civil rights laws in its importance and constitutional roots. Excluding ADA claims from § 1443(1) would be incompatible with this understanding. It would create a perverse result: A Black litigant facing racial discrimination in state court can remove under § 1443, but a disabled litigant facing disability discrimination cannot – even though both are denied their equal civil rights. The Constitution does not sanction such a hierarchy. Indeed, the Equal Protection Clause's promise of equal justice is undermined by any legal rule that prefers one class of civil-rights claim over another in terms of access to a federal forum.

3. Appellant meets the § 1443(1) criteria. She is unable to enforce her federal rights in Kansas courts. The second prong of § 1443(1) is satisfied here by overwhelming evidence that Kansas state procedures have failed or refused to enforce Appellant's ADA and constitutional rights. Under *Rachel* and *Peacock*, a petitioner must normally show that a state law or some formalized practice will prevent her from enforcing the civil right in question. While usually this is hard to show (and mere

judicial bias is not enough), this case is that rare situation contemplated in *Peacock*'s dictum where pervasive state conduct makes denial of the right "inevitable." Appellant has demonstrated a pattern of obstruction: denial of ADA accommodations, refusal to let her proceed pro se or access her case file, secret proceedings, and even continuing actions in contravention of federal removal. These are not just one judge's bad day; they reflect an institutional failure (or unwillingness) to enforce ADA Title II in Kansas courts (at least in Appellant's locale and circumstances). Even the court administrative staff (clerks, ADA coordinators) participated in sidelining her rights. In essence, the State's judicial machinery, in this instance, has been arrayed against the enforcement of federal rights – just as surely as if a state statute explicitly barred disabled persons from court (which, of course, no statute does, but the effect has been the same). Appellant exhausted state remedies (she filed grievances, appeals, complaints, lawsuits, etc.) and those avenues proved unavailing. Therefore, removal was not speculative or premature; it was a last resort to obtain a fair hearing.

4. The District Court's refusal to even consider Appellant's evidence or hold a hearing was error. By immediately remanding on a pure question of law, the lower court ignored the very serious due process concerns raised by Appellant's filings. At minimum, when confronted with colorable allegations that a state court is willfully disobeying federal law (ignoring a removal, denying ADA rights,

refusing to change venue with no subject matter jurisdiction), the federal court should pause and scrutinize the situation. The district court instead treated the matter as a routine improper removal by a disgruntled litigant. This was a failure of the court's responsibility to ensure that its own processes (like the automatic stay of state proceedings upon removal) were not being flouted. Moreover, Appellant's Notice of Removal included a valid *jury demand* for any trial, which the district court neither acknowledged nor ruled upon. While a jury demand doesn't prevent remand, the complete lack of recognition of it underscores how Appellant's case was hurriedly shunted out without normal consideration. Such a "premature closing" of the case, without a hearing or findings on the serious allegations of obstruction, itself raises due process issues. Appellate intervention is warranted to correct this and ensure that the integrity of federal process is upheld when a litigant properly invokes civil-rights removal.

5. A race-only interpretation of § 1443(1) is untenable under equal protection and modern statutory interpretation. Limiting § 1443(1) to race was a product of its time; it was not a strict holding for all eras. The Supreme Court's language in *Rachel* (construing "any law…equal civil rights" to mean laws stated in racial terms) reflected the civil rights landscape of 1966. Today, such a limitation would effectively read the word "any" out of the statute and would fail to account for subsequent expansions of federal civil rights law. Congress has not amended

§ 1443(1) to narrow it – if anything, Congress signaled broader intent by amending § 1447(d) to explicitly allow appeals of § 1443 removals, indicating these issues deserve appellate attention. The courts should interpret § 1443(1) in a manner consistent with its broad wording and purpose of safeguarding equal rights. Given that disability rights were not on the radar in 1866 or 1964 in the way they are now, it is a question of first impression whether ADA Title II fits. Appellant argues it does, because Title II, like the Civil Rights Act of 1964, "specifically prohibits discrimination" by public officials (in this case, against the disabled) and creates federal rights to equal treatment. Excluding ADA-driven removals leads to absurd results: for example, a state court that systematically excludes wheelchair users or deaf individuals from jury service could not be held to account via removal, whereas excluding on racial grounds could – even though both would violate federal law. The better reading of § 1443(1) is inclusive, allowing federal courts to protect all persons' equal civil rights when state courts won't. This case asks whether *Brown's* foundational guarantee—that the state cannot deny equal protection under the guise of neutral rules—extends to disabled litigants under the ADA. § 1443(1) must be interpreted consistent with that promise.

6. Even if this Court feels bound by precedent to exclude ADA claims from § 1443, the importance of the issue justifies Supreme Court review. This case squarely presents a novel question of national significance: Are disability civil-

rights on par with other civil rights for purposes of access to a federal forum? The Tenth Circuit could distinguish or limit *Johnson* and *Rachel* considering the Fourteenth Amendment's evolution. But if the Court believes only the Supreme Court can overturn or extend those decisions, Appellant respectfully urges the Court to consider certifying the question to the Supreme Court under 28 U.S.C. § 1254(2). The record and briefing provide a suitable vehicle. The Supreme Court, in recent terms, has shown interest in clarifying the scope of § 1447(d) and removal rights (*BP v. Baltimore*, *Yeshiva Univ. v. Y.U. Pride Alliance* (2022, involving § 1443(2))). This case adds the ADA dimension which has not been addressed at that level. The sheer gravity of a litigant effectively being denied any forum to vindicate her rights because of a categorical bar warrants such consideration.

For all these reasons, reversal of the remand order is warranted. Appellant seeks only federal jurisdiction to adjudicate her ADA claims under § 1443(1). The relief sought is simply restoration of federal jurisdiction and a chance for Appellant's claims and evidence to be addressed according to law, with the procedural safeguards (impartial forum, jury trial, etc.) that entails.

ARGUMENT

I. The District Court Erred by Holding that ADA Title II Does Not Qualify Under 28 U.S.C. § 1443(1).

Section 1443(1) allows removal of any state civil action by a person "who is denied or cannot enforce in the courts of such State a right under any law providing for…equal civil rights." The district court, following the lead of *Johnson v. Mississippi*, read this provision as if it applies *only* to laws explicitly guaranteeing racial equality. That interpretation is too cramped, overlooks the statutory text ("any law"), and is inconsistent with the purpose of the civil-rights removal statute – which is to protect federal rights when state courts fail to do so.

A. Text and Purpose of § 1443(1) Do Not Restrict it to Race.

"Any law providing for equal civil rights" is not limited to race. Congress did not insert the word "racial" or "race-only" otherwise qualify "equal civil rights" in § 1443(1). In fact, the statute traces back to Reconstruction-era legislation (the Removal Act of 1866) meant to enforce the newly adopted 14th Amendment and Civil Rights Act of 1866. At that time, racial equality was the primary focus, but the chosen language was broad. The Supreme Court in *Rachel* interpreted "any law…equal civil rights" considering what was then at issue – the Civil Rights Act of 1964's public accommodations provisions protecting Black citizens. It famously said this phrase must be construed to mean laws providing for specific rights in

terms of racial equality. Importantly, however, that holding reflected that, in 1966, virtually no other "equal civil rights" laws (for other classifications) were on the books. It does *not* eternally freeze the scope of § 1443(1) to 1966. If it did, then even laws protecting against sex discrimination or religious discrimination (enacted after the 1960s) wouldn't count – an absurd result.

The better view is that *Rachel* identified a sufficient condition (a law providing rights against race discrimination is covered) but not a necessary condition that it be race. Indeed, the statutory phrase "equal civil rights" suggests a broad principle of equality under law. In the 1860s context, that primarily meant race. In today's context, disability rights are a recognized part of the equal justice landscape – akin to race, color, religion, sex, etc. The ADA itself explicitly invokes Congress's power to enforce the 14th Amendment and speaks of eliminating "prejudice" and "stereotypic assumptions" that burden people with disabilities (see 42 U.S.C. § 12101(a), (b)). It is, by its nature, an equality law.

B. ADA Title II's Equal-Access Mandate if Grounded in Fourteenth Amendment Principles.

ADA Title II's purpose and operation align with § 1443's protections. Title II of the ADA provides that no qualified individual with a disability shall be excluded from participation in or denied the benefits of public services, or subjected to

discrimination by a public entity, by reason of their disability (42 U.S.C. § 12132). This is an *equal access* mandate – essentially a guarantee of equal civil rights in the realm of public programs and services (which include courts). The DOJ's implementing regulations under Title II require state courts to make reasonable modifications and provide auxiliary aids (like interpreters or captioning) to ensure effective communication. They also prohibit public entities from retaliating against someone for asserting ADA rights. These are specific rights to equality in treatment and access, analogous to the rights in, say, the Civil Rights Act of 1964 (which forbids exclusion based on race at hotels/restaurants) or the Voting Rights Act (no denial of voting based on race). Just as those laws secure equal civil rights in their domains, the ADA secures equal civil rights for disabled persons in accessing government and justice.

C. Supreme Court Precedent Confirms Title II Enforces Equal Rights.

A key insight: *Rachel* emphasized that § 1443(1) covers laws that provide *specific* civil rights in terms of equality, as opposed to broad constitutional provisions of general applicability. The ADA meets that test. It is not a general constitutional claim like "due process" in the air; it's a concrete statutory scheme detailing rights and remedies for a particular class of people who historically faced discrimination. Courts have long held that 42 U.S.C. § 1982 (equal property rights regardless of

race) or § 1985(3) (conspiracy to deprive equal protection) are within § 1443's scope when properly invoked, even though not explicitly referenced by the statute – because they protect equal civil rights. ADA Title II should be viewed similarly: it is essentially a modern civil rights act for people with disabilities. Excluding it just because early § 1443 cases spoke of race would be putting blinders on, ignoring decades of legislative progress.

The Third Circuit confirmed this view in *ADAPT of Philadelphia v. Philadelphia Housing Authority*, 417 F.3d 390, 394–96 (3d Cir. 2005), where it held that Title II of the ADA applies to public housing authorities and guarantees equal access to public programs, including grievance procedures and services affecting fundamental rights. The court emphasized that public entities cannot deny or impede access on the basis of disability, reaffirming that Title II provides enforceable civil rights against public actors—exactly the type of statutory protection that falls within § 1443(1)'s scope.

It bears noting that nothing in § 1443(1) or its history suggests Congress intended to exclude classes of civil-rights laws. The concern of courts in *Rachel/Peacock/Johnson* was mainly to prevent § 1443 from being misused to remove cases that only alleged general constitutional violations not involving equal rights or that were based on defendant-specific circumstances (like a claim one

can't get a fair trial due to local prejudice). Appellant's invocation of the ADA doesn't present those concerns – it's tied to an equal rights law and grounded in an across-the-board failure of a state process, not just her personal say-so.

Supreme Court jurisprudence in the 21st century treats disability discrimination on par with other civil rights. While the Supreme Court hasn't revisited § 1443 in the context of disability (indeed, § 1443 cases are relatively rare), its decisions in related areas send a strong signal. In *Tennessee v. Lane*, the Court described Congress's findings of widespread exclusion of persons with disabilities from courthouses and the "pattern of unequal treatment" as justification for strong federal remedial measures. The Court spoke of access to courts as a fundamental right and noted that failure to accommodate can be as harmful as intentional discrimination. This language elevates the issue from a mere statutory entitlement to a core civil rights concern. *Lane* essentially affirmed that Title II enforces real constitutional rights (including equal protection concepts of anti-discrimination and due process concepts of court access).

If Title II enforcement is enforcing constitutional rights, a fortiori it should be considered a law for equal civil rights in § 1443 terms. The logic of *Lane* is that disability discrimination by government is a serious constitutional matter, not a trivial administrative issue. Similarly, in *Olmstead v. L.C.* (1999), the Court held

unjustified segregation of persons with mental disabilities may violate the ADA and stem from stereotype and prejudice, akin to other forms of discrimination. The through-line is that disability rights have moved into the mainstream of civil-rights law.

D. Johnson's Race-Only Interpretation is Outdated and Unconstitutional if Applied to ADA Rights.

Stare decisis on § 1443(1) should not be read to foreclose ADA-based removal. The Tenth Circuit and other circuits have routinely quoted the *Rachel/Johnson* formulation limiting § 1443(1) to racial equality laws. Appellant acknowledges this weight of authority. However, this Court can distinguish those precedents because none of them dealt with ADA rights or a similarly new category of equal rights law. They typically involved criminal defendants or civil litigants raising either race claims or more generalized claims.

For example, in *Taos County Magistrate Court v. Currier* (10th Cir. 2015), a pro se litigant's removal under § 1443 was denied because he didn't show a state law preventing enforcement of his rights – that case did not consider ADA at all. Similarly, the Eleventh Circuit in *Goshen Mortgage v. Altier* (2023) dealt with borrowers invoking ADA in a foreclosure, and the removal failed due to lack of evidence that state court wouldn't enforce ADA. But notably, the Eleventh Circuit

did not hold "ADA is not an equal rights law" – they assumed arguendo it might be but found the removal criteria unmet on other grounds. So, there is room for this Court to be the first to squarely hold that ADA-based civil rights can support a § 1443 removal when backed by the right facts. The Supreme Court recently reaffirmed in *Students for Fair Admissions, Inc. v. Harvard College*, 143 S. Ct. 2141 (2023), that the Constitution does not tolerate systems that sort individuals into caste-like tiers for purposes of equal protection. Excluding ADA Title II from the scope of § 1443(1), while permitting removal for race-based claims, would enshrine precisely such a caste structure—placing disability civil rights below other protected statuses in terms of federal access. Just as the Court in *Bradwell v. Illinois*, 83 U.S. 130 (1873), wrongly upheld the exclusion of women from the legal profession by declaring their roles were confined to the domestic sphere, so too does an era-bound interpretation of § 1443(1) risk freezing civil rights protections in a historical frame that excludes modern classifications like disability.

In any event, if the Court finds the question close or feels constrained, it should acknowledge the tension and consider the path of certification (as raised in Issue 6). But Appellant submits that a careful reading of precedent, especially *Johnson v. Mississippi*, shows that the Supreme Court has never explicitly considered a non-racial law like the ADA under § 1443(1). *Johnson* simply reasserted *Rachel* in a case where the context was again race (it involved a Black

man's removal from a Mississippi court). Therefore, extending the reasoning to ADA is not mandated; it's an open judicial question. Given the powerful textual and logical arguments above, this Court can and should hold that Title II of the ADA qualifies as a law providing for equal civil rights under § 1443(1).

## II. Appellant Was Denied and Cannot Enforce Her ADA Rights in the Kansas Courts.

Even if one accepts that § 1443 covers ADA Title II, removal requires showing that the petitioner is "denied or cannot enforce" the specified rights in the state court. This is often the more challenging prong, because federal courts presume state courts will uphold federal law. Here, however, Appellant demonstrated an extreme situation where that presumption is rebutted. The record, as detailed in the Statement of Facts, reveals a state-court environment overtly hostile to Appellant's exercise of her federal rights.

### A. Systemic Refusal of ADA Accommodations and Access.

The state court's actions amount to an ongoing denial of Appellant's ADA rights. Appellant asserted rights under ADA Title II (and parallel Rehabilitation Act § 504) for accommodations in court, and the state court's own behavior proved those rights were not being honored. Repeated denials of accommodation (no interpreters/captions, locked transcripts) and failures to modify procedures

(refusing to allow her to participate remotely or with assistance when needed) created a situation where Appellant literally could not access the proceedings. This is a textbook violation of 42 U.S.C. § 12132, which is the right she sought to enforce. When she complained, the response was retaliation, which violates 42 U.S.C. § 12203. Kansas courts were required by federal law to have an ADA coordinator and grievance process (28 C.F.R. §§ 35.107, 35.130) – if those existed at all, they utterly failed Appellant. She filed grievances that went nowhere, indicating the state's remedial mechanisms are ineffective. In sum, the entire course of the state case demonstrates that Appellant's ADA rights were not just at risk of denial but were being actively denied at every turn. This creates a strong inference that future attempts to enforce those rights in that forum would be futile.

It's worth analogizing to *Georgia v. Rachel*: there, removal was allowed because any attempt by the defendants to assert their federal civil rights (to be served in a restaurant) in the state prosecution would have fallen on deaf ears – the state was prosecuting them for doing exactly what federal law protected. Likewise, here, Appellant was *sanctioned and penalized* (diverted arrears, denial of protections, loss of custody, etc.) for doing what federal law encourages: asserting ADA rights and informing about disability discrimination. The Kansas court's reaction to her invocation of ADA rights was antagonistic, suggesting that court is either unable or unwilling to vindicate those rights. That is precisely the scenario § 1443(1)

contemplates: when a person "cannot enforce" the right in state court, because the state court is structurally opposed or hostile to it. In *Winnebago Tribe of Nebraska v. Kinsley*, 88 F.4th 1124, 1132 (8th Cir. 2023), the Eighth Circuit held that public agencies must comply with the ADA in delivering essential services—a principle equally applicable to courts, where access is fundamental. Or in *Humphries v. Los Angeles County*, 562 U.S. 29, 36 (2010), the Court recognized a protected interest in accessing legal procedures—an interest denied here when Appellant was blocked from records, transcripts, and accommodations essential to her ADA rights.

The Sixth Circuit recognized in *Tennessee Dep't of Children's Servs. v. Winesburgh*, 614 F. App'x 277, 286 (6th Cir. 2015), that ADA Title II claims may be asserted against child welfare agencies and officials when failure to accommodate a parent's disability affects reunification and parental rights. In that case, the court allowed the mother's claim to proceed where DCS officials allegedly failed to adjust services or processes to her needs, impacting custody outcomes. Appellant's experience here is parallel: state officials denied accommodations and then penalized her for the very disabilities they refused to acknowledge, ultimately depriving her of parental contact and access to justice.

In *Robinson v. Eichler*, 795 F. Supp. 1253, 1258 (D. Conn. 1992), the court held that failing to provide a sign language interpreter violated the ADA, confirming that courts must ensure meaningful access through appropriate accommodations.

B. Procedural Barriers and Retaliation Show Inability to Enforce Rights.

This is not simply about one judge's bias. Kansas, like many states, may not have robust measures in place to accommodate pro se litigants with disabilities in complex cases. Appellant's experience spanned multiple judicial districts (she contacted ADA coordinators in at least four districts as she sought venue changes and legal remedies) and encountered not just non-compliance in each but coordination to deny, delay and retaliate. This suggests a systemic problem – possibly a lack of training, resources, or even an ingrained skepticism toward accommodation requests – which means the state judiciary as an institution was ill-equipped to enforce Appellant's rights. When multiple officials (clerks, ADA coordinator, court assistants, GAL, judge) all act in concert to thwart a litigant's rights, the usual remedy would be state appellate review. *Kan. Stat. § 75-4351 et seq.* requires interpreters for individuals with communication impairments, yet Appellant was consistently denied such access—violating both state and federal law. Appellant pursued every available remedy: her mandamus petition to the Kansas Court of Appeals was denied; judicial conduct complaints were returned or

dismissed without action; ADA grievances were denied; denied judicial reviews of Chief judges, and her appeal of a related post-judgment order provided no relief—particularly as she was denied transcripts necessary to prosecute that appeal. Additionally, her filings raising due process violations and demanding jury trials have been systematically stalled, dismissed, or quashed at the pre-discovery stage, effectively depriving her of any forum to be heard and violating her Seventh Amendment right to a jury trial. Thus, even the state appellate system did not correct the course at anytime.

Additionally, Appellant's filings allude to local corruption or prejudice. The veracity of those allegations is beyond the scope here, but the salient point is she subjectively – and reasonably – perceived that the *entire local system* was aligned against her due to her being a whistleblower and rights-assertor. When a litigant legitimately perceives that further attempts to seek justice in state court are doomed, § 1443(1) offers an escape valve (albeit a narrow one meant for extraordinary circumstances). The combination of retaliation, exclusion, delays, coordination, and procedural trickery in Appellant's case is indeed extraordinary. It rises to the level of that "rare situation" mentioned in *Peacock* where we can "clearly predict" that the state courts will not enforce the federal right. The prediction is borne out by what happened: at no point did any Kansas judge or official step up to say, "Wait, she has ADA rights, we need to accommodate her

and address her complaints." Instead, they doubled down on actions adverse to her to keep her case locked into a county that never had subject matter jurisdiction or residency for proper venue.

## C. The Case Presents an Instance of Rights Denial Without a Facially Statutory Violation.

Typically, § 1443 removals have succeeded when a state law explicitly conflicted with federal rights (as in *Rachel*, where a state trespass law was used to enforce segregation contrary to the Civil Rights Act). Here, no Kansas statute says "disabled litigants get fewer rights." But the outcome was effectively the same as if such a law existed. This Court can take guidance from *Rachel*'s logic: in *Rachel*, the Supreme Court allowed removal because federal law gave an absolute right not to be prosecuted for integrating a lunch counter – thus any prosecution was inherently a denial of that right. In Appellant's situation, federal law gives her the right not to be subjected to judicial proceedings that discriminate against her disability or retaliate for her complaints. Yet the state is effectively "prosecuting" her for asserting her rights. Therefore, any further proceedings in that state court, absent a shift in attitude, will "constitute a denial of the rights" conferred by the ADA just as surely as in *Rachel.*

It's true that Appellant's case is a civil matter, not a criminal prosecution as in the 1960s cases. But § 1443(1) applies to "any civil action" as well. The form of the case doesn't matter if the substance is that the person's civil rights cannot be upheld in that forum. Courts have permitted § 1443 removal in civil contexts on occasion, especially when state proceedings threaten federal rights. This Court should likewise recognize that subject matter jurisdiction + disability discrimination = denial of equal protection that is as significant as other civil rights denials. The harm to Appellant (loss of her child, loss of access to legal process) is irreparable and grave – on par with harms that have justified injunctive relief in other contexts. Elrod v. Burns famously said that even temporary loss of First Amendment freedoms is irreparable injury; here Appellant has endured the loss of fundamental parenting rights without due process for seeking proper venue jurisdiction, which is at least as severe. As the Supreme Court held in *Shelley v. Kraemer*, 334 U.S. 1 (1948), even facially neutral judicial enforcement mechanisms can violate the Fourteenth Amendment when they operate to entrench discrimination. Just as courts in *Shelley* could not constitutionally enforce racially restrictive covenants, courts today cannot lend their power to exclude disabled litigants through administrative indifference and procedural barriers.

In conclusion on this prong, Appellant satisfied the requirement to show she was denied or cannot enforce her rights in state court. The district court did not

meaningfully grapple with this, since it wrongly cut off inquiry after deciding the ADA wasn't covered. This Court's de novo review should lead it to conclude that if ADA rights are cognizable under § 1443(1), then this factual record meets the threshold to justify removal: the state court's pattern of conduct was effectively an announcement that Appellant's ADA rights would not be recognized. Section 1443(1) was designed to interpose federal protection in exactly such a scenario.

III. The Premature Remand Deprived Appellant of Due Process and Undermined § 1447(d) Review.

A. Full Scope of Appellate Review is Permitted Under § 1443(1).

As discussed in the Jurisdictional Statement, 28 U.S.C. § 1447(d) not only permits but invites appellate scrutiny when a remand involves § 1443. The Supreme Court in *BP P.L.C. v. Baltimore* clarified that an appellate court in that posture may review *the entire remand order*, not just the § 1443 ground. Here, that means this Court can consider if the district court should have handled things differently procedurally. One glaring issue is the jury trial demand and the related concept that Appellant was seeking to have the merits of her case heard by an impartial jury in federal court. By remanding without a hearing, the district court effectively nullified her jury demand without explanation. While technically a jury demand

doesn't guarantee a federal forum, it underscores how Appellant's attempt to secure a fair trial was cut off. Moreover, because the remand order is reviewable, this Court can remedy any procedural shortcomings that accompanied it. If the record wasn't adequately developed due to the rush to remand, this Court can direct the district court to allow proper process on remand. By remanding prematurely, the district court foreclosed Appellant's ability to pursue relief under 42 U.S.C. § 1983—blocking a federal remedy for ADA and due process violations by state officials acting under color of law.

B. Failure to Address Jury Demand and Evidentiary Motions.

Appellant had a motion to compel the state court to release records (Dkt. 10) and multiple notices documenting misconduct. The magistrate and district judge ignored or summarily denied these as moot once they decided on remand. This is problematic. If a core allegation is that the state court is hiding or altering the record, the federal court should secure that record before deciding jurisdiction. There were tools available: the district court could have ordered the state clerk to produce the complete docket and transcripts. Instead, by denying the motion to compel and remanding, the court possibly enabled the continuation of the very procedural wrongs Appellant complained of (indeed, after remand, Appellant never got those missing records, and the state docket remained problematic). This Court

should consider this context – it may not reverse just because a motion wasn't ruled on, but it can note that fairness would have counseled at least ensuring that the removal process wasn't being subverted by the state's non-compliance.

The district court's failure to acknowledge or rule on Appellant's properly demanded jury trial prior to remand violated the Seventh Amendment and procedural fairness. As the Supreme Court held in *Beacon Theatres*, "The right to a jury trial of legal issues is not to be avoided by the expedient of trying the equitable issues first," 359 U.S. at 510. Here, the court bypassed the requested jury process entirely—foreclosing federal factfinding and reinforcing the pattern of summary exclusion already present in state proceedings.

Furthermore, the district court did not hold a hearing despite the serious accusations of misconduct. Given that credibility or state of mind of state officials wasn't at issue (it was mostly documented facts), a hearing wasn't strictly necessary to resolve the legal question. But from Appellant's perspective, never having a chance to *verbally* explain her plight or emphasize the urgency was a form of judicial deafness akin to what she experienced in state court. A short hearing might have enlightened the court to nuances that the cold record didn't convey. This is a discretionary matter, but one relevant on appeal because it shows the case wasn't handled with the usual care afforded to civil-rights litigants. If

anything, pro se filings alleging systemic rights violations should receive *more* careful attention, not less.

C. Premature Remand Enabled Irreparable Harm.

Appellant's situation deteriorated after the case was sent back: no remedial measures were in place, and the state court resumed business as usual – to Appellant's detriment. Had the federal court retained jurisdiction (even if ultimately deciding against Appellant later), it could have at least imposed conditions or monitored the state court's compliance with ADA in the interim. Once remanded, the federal court lost the ability to do anything, and Appellant was left without a remedy. This underscores the "irreparable harm" aspect: if a federal court wrongly remands a civil-rights case that should have been retained, the petitioner loses the protective shield that Congress intended § 1443 to provide, and whatever constitutional injury was happening will continue unabated. Courts recognize that the loss of constitutional rights, even temporarily, is irreparable injury. Here it's not just temporary; every day in state court for Appellant meant further violation (denial of seeing her child, denial of access to filings, etc.). Thus, the stakes of this appeal are not merely academic or procedural – they are about preventing ongoing harm.

Finally, by hearing this appeal and potentially reversing, this Court also affirms an important principle: state courts are not above the law, and federal courts will intervene when necessary. That message can have a salutary effect on state actors' behavior. On the flip side, if the remand stands, it may embolden a view that if a case doesn't fit neatly into the traditional race paradigm, state judges can act with impunity toward disabled litigants without fear of federal oversight. That is a dangerous message that this Court should dispel.

## CONCLUSION

The appellate court's intervention here serves the fundamental purpose of § 1443: to act as a guardian of federal rights when state courts falter. By reversing the remand, this Court will not only correct the immediate injustice to Appellant but also reinforce the principle that "Equal Justice Under Law" applies to all – including those with disabilities – in every court of this nation. This case presents a matter of substantial interest to disability rights organizations, constitutional scholars, and civil rights amici. This Court must not allow a modern variant of *Korematsu*, where deference to institutional inertia results in a structurally excluded class—disabled litigants—being denied access to justice under color of law.

RELIEF REQUESTED

Appellant respectfully requests that this Court:

1. **Reverse the district court's remand order**, finding that ADA Title II qualifies as a "law providing for equal civil rights" under 28 U.S.C. § 1443(1);

2. **Remand to the district court** with instructions to:

   - Conduct a proper legal analysis of Appellant's removal under § 1443(1), including the constitutional status of ADA Title II,

   - Address Appellant's outstanding motions, acknowledge notices, ADA accommodations, and her jury demand,

   - Evaluate whether the procedural exclusion constituted denial of rights under Title II of the ADA and applicable constitutional guarantees;

3. **Acknowledge** Appellant's right to seek preservation of the federal record under FRAP 10(e) and make appropriate findings regarding procedural obstruction that prevented enforcement of federal rights in the lower court.

4. Appellant also requests any other relief that the Court deems just and appropriate.

Recognizing ADA Title II under § 1443(1) restores constitutional parity and prevents further irreparable harm to a disabled litigant denied access to justice.

Respectfully submitted,                                    Date: July 22, 2025


\_\_/s/ Angeliina Lynn Lawson \_\_\_

Angeliina Lynn Lawson, Pro Se Appellant

███████████████████████

████████████████████████

---

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify that this brief is oversized by 876 words and a Motion for Leave for Length of Words accompanies of Fed. R. App. P. 32(a)(7)(B). This brief contains <u>6,053</u> words (full brief is 12,608 words), excluding the parts exempted by Rule 32(f) (cover page, tables of contents and authorities, certificates, etc.).

I further certify that this brief complies with the typeface and format requirements of Fed. R. App. P. 32(a)(5)–(6). The brief was prepared using Microsoft Word in a proportionally spaced 14-point double spaced volume Times New Roman font.

Respectfully submitted,                          Date: July 22, 2025


__/s/ Angeliina Lynn Lawson ___

Angeliina Lynn Lawson, Pro Se Appellant

██████████████████████████

████████████████████████████

---

## STATEMENT REGARDING ORAL ARGUMENT

*Appellant believes that oral argument would aid this Court's*

*disposition of the appeal.*


Respectfully submitted,                          Date: July 22, 2025


__/s/ Angeliina Lynn Lawson ___

Angeliina Lynn Lawson, Pro Se Appellant

██████████████████████████

████████████████████████████

---

## CERTIFICATE OF SERVICE

*I certify that on* July 21, 2025*, the foregoing opening brief was filed electronically through CM/ECF. Notice of this filing will be sent by U.S mail to all parties by operation of the Court's electronic filing system, including*:

Jonathan David Lawson

████████████████████████████

Respectfully submitted,                                    Date: July 22, 2025

__/s/ Angeliina Lynn Lawson ___

Angeliina Lynn Lawson, Pro Se Appellant

████████████████████████

███████████████████████████