IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

Case No. 25-3097

ANGELIINA LYNN LAWSON,

Appellant,

v.

JONATHAN DAVID LAWSON,

Appellee.

MEMORANDUM IN SUPPORT OF ORDER FOR HEARING OF FRAUD UPON THE COURT

*(Constitutional and Human Rights Impact under § 1443)*

I. INTRODUCTION AND PURPOSE

Appellant respectfully submits this memorandum in support of her pending hearing of the Motion for Panel Ruling on Fraud Upon the Court. This memorandum is as a sworn narrative and constitutional impact statement addressing the real-world trauma and civil rights injuries caused by the lower court's conduct and the denial of § 1443 federal protection. It serves to contextualize the lived experience of judicial injury, systemic silencing, and the urgent need for appellate oversight before further irreparable harm occurs.

II. LEGAL BACKGROUND – § 1443 DENIAL AND ITS CONSEQUENCES

In this case, a disabled, indigent mother (Petitioner) sought to remove her state custody proceedings to federal court under 28 U.S.C. § 1443, the civil rights removal statute. Her goal was to secure a fair forum free from the pervasive bias and civil rights violations she faced in Kansas state courts. Unfortunately, removal was denied on the grounds that § 1443 has been narrowly interpreted to apply only to violations of laws providing for racial equality[1][2]. The U.S. Supreme Court's decisions in *Georgia v. Rachel* (1966) and *City of Greenwood v. Peacock* (1966) construed the phrase "any law providing for… equal civil rights" in § 1443(1) to mean only those rights stated in terms of racial equality[1]. Broad claims of due process or other rights do not qualify for removal under this statute[1]. In other words, because the alleged civil rights deprivations here were based on disability and denial of due process not race the federal courts (bound by Supreme Court precedent) refused to allow removal[3]. The Tenth Circuit itself has held that *"because the ADA protects against discrimination due to disability, and not due to race, a denial of ADA rights does not support § 1443(1) removal."*[3].

This restrictive interpretation effectively rewrote the removal statute beyond what Congress originally intended in the Reconstruction era. Congress's 19th-century text contained no such limitation to race, and was meant to protect federal equal rights broadly[4]. By judicially narrowing § 1443 to race-based cases, the Supreme Court stripped vulnerable classes like disabled litigants of a crucial tool Congress provided to protect fundamental rights in hostile state forums. Petitioner's experience starkly illustrates the human cost of this limitation. Had she been allowed to remove her case under § 1443, much of the ensuing trauma and injustice could have been avoided. Instead, she was forced to endure years of futile litigation in multiple courts, as detailed below, while her child and she suffered ongoing harm.

Because § 1443 removal was denied, Petitioner was left to seek justice through the regular state and lower federal courts. Exhibit E (Summary of Prior Lawsuits) documents an astonishing pattern of sixteen different filings across various courts, all stemming from the same underlying custody dispute and civil rights violations. The proceedings included federal civil rights lawsuits, a RICO action, state trial and appellate cases, and numerous extraordinary writ petitions. Not one of these filings was permitted to reach a trial, evidentiary hearing, or decision on the merits[5]. Key points from Exhibit E include:

- Total Filings: roughly 16 cases including § 1983 civil rights claims, ADA discrimination/retaliation claims, small claims, a federal RICO conspiracy lawsuit, attempts to remove the case to federal court, and multiple appeals and original writ petitions.

- Universal Lack of Merits Hearings: *"Discovery denied in 100% of cases"* and *"not once has [Petitioner] been permitted a jury trial, evidentiary hearing, or full discovery"*[5]. Every case was cut off prematurely via procedural maneuvers.

- Patterns of Obstruction: Many cases were dismissed or stalled under irregular circumstances in forma pauperis (IFP) applications were ignored or "skipped," summons were withheld for months, subpoenas were quashed or never enforced, and cases were abruptly dismissed especially after Petitioner requested ADA accommodations[5][6]. In one state case, the defendant (opposing party) actually defaulted by not responding, yet the court refused to enter default judgment for Petitioner; instead, the case was dismissed in the defendant's favor and Petitioner was even sanctioned without a hearing[7]. This is virtually unheard of in a system ostensibly governed by neutral procedure.

- No Relief from Appeals or Higher Courts: When Petitioner appealed or sought supervisory writs, she met further roadblocks. For example, a federal appeal of the remand (removal denial) was "rapidly remanded" back to state court within 9 days, with no opportunity to brief or develop the record[8]. State appellate courts either ignored her petitions or summarily denied relief without addressing the serious merits. Even a civil RICO lawsuit (Case 6:25-cv-01179 in D. Kan. 2025) which detailed the conspiracy among the players in her case was stayed and never allowed to proceed to discovery[9][10]. Petitioner even invoked a statutory provision to request a three-judge out-of-district panel (to get an unbiased tribunal), which was flatly denied[11].

The mind map Exhibit F and Exhibit E's table underscore how denial of a federal forum led to a domino effect: Petitioner bounced from one court to another in an effort to vindicate her rights and protect her child, only to be met with delay, dismissal, or outright abuse of discretion at every turn[5][6]. This pattern is not merely procedural bad luck; it evidences a deeper systemic bias and dysfunction. The very fact that Petitioner had to file sixteen actions (and counting) to try to address the same core issues is proof enough that something is profoundly wrong in the state's administration of justice. It also powerfully reinforces why Congress provided § 1443 in the first place to prevent such a spiral of injustice when state courts cannot or will not enforce basic federal rights.

The denial of § 1443 protection forced Petitioner into a procedural maze that no disabled litigant should endure, as the following sections demonstrate through cascading litigation and systemic failures.

III. STRUCTURAL BREAKDOWNS OF JUDICIAL OVERSIGHT

Higher judicial authorities and oversight bodies have, thus far, failed to intervene despite clear red flags. Petitioner's saga raises urgent questions about the duty of both state appellate courts and federal courts to supervise lower tribunals, especially in cases implicating fundamental rights. She invoked every possible oversight mechanism writs of mandamus, writs of habeas corpus, writs of prohibition, writs of certiorari, emergency injunctive relief, and more seeking someone in authority to rein in the lawlessness occurring below. Yet each plea was ignored or denied, often perfunctorily. This amounts to a *de facto* breakdown of checks and balances: no court is holding the misbehaving judges, attorneys, and agencies accountable.

Critically, the rights at stake are among the most fundamental in our legal system. The right of a parent to the care, custody, and companionship of their child is a core liberty interest protected by the Constitution. The U.S. Supreme Court has recognized that *"the interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests"* recognized by the Court[12]. These inherent rights long predate the government they are exactly the kind of natural rights retained by the people when governments are formed. The Bill of Rights and centuries of common law jurisprudence affirm that the state must not interfere with a fit parent's rights absent extraordinary circumstances and rigorous due process. Yet in this case, a fit mother was effectively erased from her child's life through patently unjust proceedings.

Equally fundamental is the right to due process and a fair trial. Petitioner was entitled to a speedy and fair adjudication of any accusations against her in the custody matter, with the opportunity to be heard, present evidence, and challenge the evidence against her. Instead, her case was decided through ex parte maneuvers, secret communications, and procedural ambush all without a single

full hearing on the merits. Such conduct not only violates constitutional due process, but also offends the basic maxims of justice ("no one shall be judge in their own cause," "no wrong without a remedy," etc.). The failure of the Kansas courts to rectify these violations and the refusal of federal courts to step in demonstrate a complete collapse of the safeguards that are supposed to prevent tyranny and protect individual rights.

It is particularly alarming that the only reason federal intervention was withheld is a judicially imposed limitation on § 1443 removal. Congress saw the need for federal protection in situations of state injustice, but the Supreme Court's race-based limitation (from the *Rachel* case) left disabled individuals like Petitioner with no equivalent remedy[1]. This is a stark illustration of the judiciary stepping outside its jurisdiction to narrow a remedy Congress created. Petitioner's story asks the Tenth Circuit and ultimately the Supreme Court to confront the real-life consequences of that decision. The courts' lack of oversight has allowed a travesty of justice to fester in the lower courts, under the false assumption that such extreme corruption and bias could not possibly be happening. It *is* happening, and the harm is immeasurable.

IV. RACKETEERING PATTERNS AND ENTERPRISE MOTIVATION

Beyond the individual misconduct of actors in this case, the pattern reflects systemic incentives and biases that have turned some family courts into profit-driven enterprises. Petitioner alleges that her case was effectively hijacked by what she terms a "Family Court Enterprise" a network of colluding attorneys, guardians ad litem (GAL), therapists, and even judges who coordinated to prolong litigation and generate fees, all under the guise of serving the child's "best interests." This goes beyond mere conjecture. In her federal civil RICO complaint, she documents how,

after the wrongful custody change, multiple professionals conspired to sever the child's relationship with the mother and then financially profit from the fallout. For instance, the GAL and father's attorney worked hand-in-hand to engineer an "emergency" ex parte custody transfer (without notice to Petitioner) and then to obstruct visitation, block communication, and fabricate justifications for keeping mother and child apart[13][14]. The child was told that "in order to be close with [Dad] he would have to erase [Mom]"[15] a chilling example of psychological manipulation that is documented in court filings.

Financial motives lurk behind these maneuvers. Petitioner's evidence shows that court-ordered child support arrears owed to her were redirected to pay the very GAL and therapists who were helping the father alienate the child[16][17]. The father's attorney, meanwhile, encouraged him to violate court orders and delay proceedings, explicitly to *"provoke more hearings and increase litigation costs,"* thereby converting the custody case into a *"revenue stream for the enterprise."*[18] This aligns with a well-known criticism that federal funding schemes can distort the impartiality of family courts. Under Title IV-D of the Social Security Act, state courts and agencies receive federal incentive payments based on child support orders and enforcement. In fact, a recent petition to the U.S. Supreme Court pointed out that courts are literally *paid* when they label one parent as "noncustodial" and set a support obligation, and questioned whether "payment of federal grants to incented courts predicated on their rulings" undermines judicial neutrality and due process[19][20]. The *institutional profitability* of the current system has been noted by commentators as a reason such injustices persist[21]. Here, the dynamic was laid bare: by eliminating Petitioner as a custodial parent, the enterprise not only achieved the father's personal aim (avoiding child support and alimony arrears) but also opened the door to siphon off funds through legal fees, therapy bills, and even federal incentive dollars tied to the case. This is

7

family court turned into racketeering a perversion of justice that Congress's civil RICO law, 18 U.S.C. § 1962, was designed to address.

Crucially, these systemic problems flourished because no independent authority stepped in. When Petitioner tried to have criminal charges brought for what was happening (e.g. the alleged bribery of a judge, submission of false evidence, and kidnapping via fraud), local law enforcement and officials refused to act. Complaints were made to at least three county sheriffs, a county district attorney, and county commissioners all to no avail. The response was indifference or outright refusal to investigate the serious allegations. This lack of accountability emboldened the perpetrators. Petitioner reports that a whistleblower has come forward with information that the father's attorney (BreAnne Poe) bribed the presiding judge (Judge Godderz) to secure favorable decisions. The FBI is reportedly investigating this bribery scheme. Yet even with such explosive allegations, the state judiciary took no corrective action no recusal, no mistrial, nothing. Every actor in the Kansas system seemingly closed ranks to protect the "business as usual" of this enterprise, at the expense of a mother and child's fundamental rights. It is exactly in such extreme and dire circumstances that federal intervention is not only warranted but required to uphold the rule of law.

V. VICTIM IMPACT STATEMENT – TRAUMA TO MOTHER AND CHILD

Behind the case numbers and legal arguments lies a profound human tragedy. Petitioner and her child have endured trauma that no family should ever suffer and it was inflicted not by an unavoidable accident or illness, but by the intentional misuse of power in our courts. The impact on the child (now a teenager) has been devastating. Once a healthy honors student, the child

experienced an "academic collapse" after being forcibly separated from his mother – *"from Honors student to F's, D's, C's"* in his classes[22]. He began suffering severe emotional and physical symptoms: *"daily nosebleeds, significant weight loss, extreme anxiety"* to the point that he would jump at the slightest sound[23]. Medical needs were neglected; he went months without prescribed therapy or even basic healthcare. His own words, quoted above, reveal the psychological torture of the situation he felt he *had to erase his mother* to maintain a relationship with his father[15]. No child should be put in the position of having to choose one parent by destroying the other. This is state-sanctioned parental alienation in its most extreme form, and it is nothing less than child abuse. Studies confirm that such post-separation abuse and coercive control by one parent can cause serious, long-term harm. Research shows that *family court-involved domestic abuse* leads to worsened outcomes and even increased risk of lethality: *"Separation, divorce, and child custody disputes… were identified as precursors to nearly half (46%) of family homicides involving multiple victims"*[24]. When an abusive or highly controlling parent loses control, the situation can escalate dangerously. In fact, one landmark study found that a high-control abuser combined with separation increased the risk of femicide (murder of the mother) nine-fold[25]. Disturbingly, 61% of cases of child homicide-suicides in one analysis involved ongoing intimate partner problems or custody conflicts[25]. These statistics underscore that what Petitioner fears is not hyperbole it is a documented phenomenon. The most dangerous time for a victim of domestic violence is when they attempt to leave or enforce their rights regarding children. This mother and child have been living in that danger zone for over a year now.

Petitioner's personal suffering is likewise immense. She has effectively been *punished for trying to protect her child*. The court system's bias was so extreme that it portrayed her the protective

parent as the villain, while shielding the father's misconduct. There exists a "culture of mother-blaming" in many family courts, where mothers who report abuse are not believed and are even treated as if *they* are the problem[26]. Petitioner experienced exactly this: after she raised concerns about her child's safety and her ex-husband's instability, the narrative was twisted to paint her as uncooperative, mentally unstable, or alienating none of which was true, as evidenced by her eventual vindication in criminal court. (Notably, the father is now facing criminal battery charges for his violence, corroborating everything Petitioner warned the courts about.) Yet during the civil case, her reputation was systematically destroyed. She was gagged by court order from even telling her side publicly, while the father's agents freely spread defamatory claims that "she has no parental rights." She lost clients and her successful real estate business due to the stigma and constant litigation demands eventually being forced to take a low-wage job just to survive[27][28]. She went from earning a substantial income to working at McDonald's for $14/hour, even suffering physical injuries (grease burns) on that job[29], all as a direct result of the protracted legal assault against her. This is economic abuse compounded on top of the emotional trauma.

Even more horrifying have been the threats to Petitioner's safety. The father's obsessive quest to erase Petitioner from the child's life has manifested in stalking and menacing behavior. Petitioner has reported strangers (hired private investigators, allegedly) lurking outside her workplace and home. There have been attempted break-ins, and her computer was hacked with spyware to surveil her. The father repeatedly made suicidal and homicidal threats ("if I can't have my way, I'll harm myself or others"), putting the child in fear as well. The local authorities did nothing, likely influenced by the "smear campaign" painting Petitioner as just a disgruntled litigant. Petitioner genuinely fears that she or the child could be killed before this is over. She has

stated that if she does regain custody or even normal visitation, she may need a witness protection program to feel secure from retaliation. These are shocking statements to be made in America, about a case that ostensibly started as a family custody matter. But this is the reality on the ground. Tragically, case histories show that court failures can indeed be fatal – time and again we have seen news of a parent (often the father) who, pushed to a corner or enraged by the loss of control, turns violent and harms or kills the ex-spouse or children. Petitioner is determined to prevent such an outcome, but she cannot do it alone. She needs the judiciary to finally open its eyes and take action *before* it's too late. The courts' "rose-colored glasses" view assuming that if there was really wrongdoing, *some* other court or agency would have fixed it by now must be shattered by the undeniable record of what has transpired.

This trauma is not speculative it is ongoing, medically documented, and escalating. Without intervention, the court risks endorsing a framework of judicial violence masked as procedure.

VI. THE NEED FOR FEDERAL INTERVENTION AND RELIEF

Petitioner's case is a wake-up call to the Tenth Circuit and the Supreme Court. It is a real-life exhibit of how a breakdown in judicial oversight can breed *exactly the kind of tyranny and injustice our system of laws is meant to prevent*. This is fraud upon the court in the most egregious sense: officers of the court subverting the judicial process for personal gain and bias, to the point of effectively kidnapping a child and persecuting a parent under color of law. Such conduct "shocks the conscience" and demands a swift, strong remedy. Petitioner respectfully submits that the only way to restore justice is for the higher courts to fully acknowledge the harm done, grant the relief necessary to void the fraudulent orders, and ensure a proper forum for a fresh, fair adjudication of the custody and related issues. Moreover, this Court should recognize

11

that *disabled and indigent litigants alleging violations of fundamental rights* deserve access to the same federal protections as others. The limiting of 28 U.S.C. § 1443 to racial cases has, in this instance, enabled blatant injustice against a disabled person a result that conflicts with the spirit of equal protection and modern understanding of civil rights. Congress never said "race only" in the statute; the courts put that gloss on it[1]. Perhaps it is time to re-examine that precedent, or at least to invoke other avenues (such as 28 U.S.C. § 1651 All Writs Act or inherent supervisory authority) to remove cases when state courts run amok.

V. CONCLUSION – PRESERVE RIGHTS, PREVENT FURTHER HARM

In the end, this case is about a parent's love for her child and a citizen's faith in the rule of law. Petitioner has fought tirelessly, at great personal cost, not just for herself but to shine a light on the broader *"pattern of racketeering"* and abuse of power infecting the system. She has shown remarkable courage in the face of intimidation and despair. Now she asks this Court for justice real, substantive justice that has been denied for far too long. The fraud upon the court must be recognized and remedied. The integrity of the judiciary, the sanctity of parent-child bonds, and indeed the public's trust in our legal system hang in the balance. It is time to end this nightmare and prove that *"We the People"* are still protected by the promises of our Constitution and laws.

Sources Cited:

1. Georgia v. Rachel, 384 U.S. 780, 792–93 (1966)[1][2] (construing 28 U.S.C. § 1443 to apply only to laws providing for specific civil rights stated in terms of racial equality, not general constitutional claims).

2. *Taos Cnty. Magistrate Ct. v. Currier*, 625 F. App'x 358, 361 (10th Cir. 2015)[3] (ADA-based disability discrimination does not support removal under § 1443(1) because that statute covers only rights relating to racial equality).

3. Exhibit E – Summary of Prior Lawsuits (Litigation History of Angeliina Lawson)[5][7].

4. RICO Complaint, Lawson v. Godderz et al., Case 6:25-cv-01179 (D. Kan. 2025)[15][22] (alleging conspiracy of officials to interfere with custody; documenting child's statements and deterioration).

5. Post-Separation Abuse Literature Review, *Journal of Family Trauma* (2023)[24][25] (finding separation and custody disputes correlate with higher risk of lethal violence and harm to women and children).

6. *Troxel v. Granville*, 530 U.S. 57, 65 (2000)[12] (affirming that a parent's right to raise one's child is "perhaps the oldest of the fundamental liberty interests" recognized by the Court).

7. Bent v. Bent, Petition for Certiorari, No. 18-888 (U.S. filed Jan. 2019)[19][20] (questioning constitutionality of Title IV-D incentive payments to state courts and whether such financial incentives compromise impartiality and due process).

8. Exhibit F (Mind Map) – Visual diagram of the interrelated cases and proceedings stemming from the initial custody case. (Illustrates the procedural web Petitioner navigated due to the lack of a single fair forum.)

Respectfully submitted,                                       Dated: October 16, 2025

/s/ Angeliina Lynn Lawson
Angeliina Lynn Lawson, Pro Se
(Address on file)
AngeliinaCourtRecords@gmail.com

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, understanding, and belief.
Executed this 16th of October, 2025 in Leavenworth County, Kansas.

/s/ Angeliina Lynn Lawson

Angeliina Lynn Lawson, Pro Se

(Address on file)

CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October 2025, I served a true and correct copy of the foregoing Victim Impact Statement on all parties by filing it with the Clerk of the United States Court of Appeals for the Tenth Circuit via CM/ECF.

Respectfully submitted,

/s/ Angeliina Lynn Lawson

Angeliina Lynn Lawson, Pro Se

Exhibit E – Summary of Prior Lawsuits

Litigation History – Jury Trials and Discovery Denied in 100% of Cases. Each of the sixteen filings had a clear legal basis (ADA retaliation, §1983 civil rights, RICO, removal for federal protection, and appeals). Not once has Plaintiff been permitted a jury trial, evidentiary hearing, or full discovery. This pattern compelled the civil RICO filing and the statutory request for reassignment to a three-judge out-of-district panel a request the District Court has likewise denied.

| Case No. | Court | Year Filed | Core Claims | Outcome | Jury Trial Granted? |
|---|---|---|---|---|---|
| Judge Broomes, Mag. James 2:25-cv-02199 | D. Kan. | 2025 | ADA retaliation, civil rights, custody interference | IFP granted, summons stayed, case stalled, dismissed without hearing | No |
| Judge Broomes, Mag. James 2:25-cv-02171 | D. Kan. | 2025 | ADA retaliation, denial of access, GAL misconduct | IFP granted, stayed, AG shielded from default, sudden dismissal | No |
| Judge Broomes, Mag. James 2:25-cv-02251 #25-3167 | 10th Circuit Appeal D. Kan. | 2025 | Civil rights, ADA retaliation, Bolton misconduct | IFP granted, summons withheld 190+ days | No |
| Judge Broomes, Mag. James 5:25-cv-04045 #25-3097 | 10th Circuit Appeal D. Kan. | 2025 | Circuit Appeal premature remand, Federal removal, ADA protections | Rapid remand within 9 days, no chance to build record, no hearings | No |
| Judge Broomes, Mag. James 6:25-cv-01179 #25-3158 | 10th Circuit Mandamus & Judicial Complaints D. Kan. | 2025 | Civil RICO, ADA retaliation, enterprise | IFP granted, summons stayed, discovery denied | No |
| Judge John Bryant Leveanworth Dist. LV-2025-cv-70 #129341 | Kansas Ct. Appeal | 2025 | State appeal of sanctions, ADA retaliation | Defendant defaulted, judge instead granted dismissal, denied disqualification | No |
| Judge John Bryant | Kansas State Court | 2025 | Custody interference, ADA retaliation, contempt | Coercive dismissal, procedural improper, | No |

| Case No. | Court | Year Filed | Core Claims | Outcome | Jury Trial Granted? |
|---|---|---|---|---|---|
| Leavenworth Dist. Ct. (two dockets) | | | | skipped over IFP, no jurisdiction | |
| Judge Rhonda Mason Johnson Dist. Ct. JO-2025-cv-623 #129688 | Kansas Appeal Ct. | 2025 | Fraud, misrepresentation | 180 days inaction; ADA retaliation, motion disqualification, sudden dismissal | No |
| Judge Keven O' Grady Johnson Dist. Ct. JO-2025-DM-1717 #129635 | Kansas Ct. Appeal | 2025 | State Appeal of no jurisdiction, ADA retaliation, no cause | Denied; change of venue, jury trial, slandered and defamed my character with no ability to testify | No |
| Judge Eric Godderz Anderson County 2020-DM-131, Fraud on Court | Fed. Removed. Kansas State Court | 2020-ongoing | Fed. removal for no jurisdiction, ADA retaliation, access rights. | Dismissed, not docketed, or labeled "correspondence", continues to slander and defame my character across the state | No |
| Judge McEntee Small Claims (5 cases) Appealed to civil court in Johnson County | Kansas Court Appeal De novo | 2025 | Unilaterally dismissed, no hearing, right after ADA accommodations requested | Dismissed, after proper service of summons and hearing dates set. Appeal judge sitting on cases no movement on motions to set CMO or jury trial | No |

Summary

- Total Lawsuits Filed: 16 / Jury Trials Granted: 0
- Pattern: In every case, Plaintiff's constitutional right to a judicial forum was extinguished before the merits could be heard. Courts repeatedly relied on procedural devices such as stays of service, coerced dismissals, premature remands, blanket discovery denials, and sanctions or retaliated after ADA accommodation requests. This systemic denial of access demonstrates structural bias and validates the necessity of reassignment to neutral, out-of-district judges under 28 U.S.C. §§ 292(b), 294.

# Exhibit F

## Anderson County 2020DM131 — Case Network

**Connected cases and filings:**

- JO25CV623 → Notice of Appeal
  - JOCV2283, JOCV2286, JOCV2287, JOCV2289, JOCV2290
  - JO347, JO354, JO355, JO356, JO357
- LV25CV92 $
- LV25CV70 Defaulted → KS Appeal Defaulted → No Oral Summary Calendar Notice
- LV25CV95 $
- Writ of Mandamus Godderz
- Writ of Prohibition Godderz → SCOTUS Appeal 25-3167
- 1443 Removal 5:25CV → 10th Appeal 25-3097 DEFAULTED → Fraud on the Court
  - → Certified question SCOTUS
- RICO 6:25CV1179 → Broomes James → Out of district judges → 3 panel
  - → Tenth Circuit Writ of Mandamus
- Judges 2:25CV2199 (Mag Dismissed Inaction Disqualification) → Appeal
- GAL 2:25CV2171 (130 days???? Inaction Disqualification) → Appeal 25-3167
- DCF 2:25CV2155 (Inaction) → DCF 2:25CV2155